COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Felton, Judge Haley and Senior Judge Coleman


MICHAEL ALLEN CLARK, SR.

                                                         MEMORANDUM OPINION[*]
v.         Record No. 0485-08-2                              PER CURIAM
                                                         SEPTEMBER 30, 2008
ORANGE COUNTY DEPARTMENT
  OF SOCIAL SERVICES


                    FROM THE CIRCUIT COURT OF ORANGE COUNTY
                              Daniel R. Bouton, Judge

           (Christian A. Brashear, on brief), for appellant. Appellant
           submitting on brief.

           (Robert F. Beard; Michael J. Hallahan, II, Guardian *ad litem* for the
           minor child, on brief), for appellee. Appellee and Guardian *ad
           litem* submitting on brief.


       Michael Allen Clark, Sr. (hereinafter "father") contends the trial court erred in

terminating his parental rights to his son, M.C.[1] For the reasons stated herein, we affirm the trial

court's decision.

                                          Background

       We view the evidence[2] in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

       [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

       [1] In his opening brief, appellant asserts that the termination hearing took place on August
2, 2007, but the agreed upon statement of facts notes that the termination hearing occurred on
August 9, 2008. As father appealed the trial court's decision on February 25, 2008 we shall
assume that the termination hearing was held in early August 2007.

       [2] The facts are drawn from the statement of facts filed with this Court in lieu of a
transcript pursuant to Rule 5A:8.

M.C., born September 23, 2005, was removed from his parents' custody when he was three months old based upon charges of abuse and neglect. The goals established for father in February 2006 were as follows: participating in parenting and anger management classes, working with a teaching parent, finding suitable and affordable housing and maintaining it for six consecutive months, maintaining employment for six consecutive months, practicing good money management skills, participating in visitation, and undergoing a mental health evaluation.

Father failed to appear at the permanency planning hearing on March 6, 2006, despite efforts by the Orange County Department of Social Services (DSS) to get in touch with him. Sue Gooden was the social worker initially assigned to M.C.'s case. Gooden testified she had difficulty staying in touch with father because he moved frequently and because domestic violence issues existed between father and M.C.'s mother. When Gooden first met with father, he told Gooden he was afraid of "losing it" with the child. DSS offered to pay for a psychiatric evaluation, but father declined the offer.

Father visited Gooden's office in May 2006 and swore at her for not working with him, complaining that the teaching parent was a "complete waste of time." In late May 2006, father refused to provide DSS with his address and told Gooden he was "moving to another country."

Patrick Eckles, an independent contractor associated with DSS, provided services to father from February 17, 2006 through May 31, 2006. Eckles attempted to assist father in finding employment, but was unsuccessful because father refused to seek full-time work. Father worked occasionally as a ground tree crew worker.

Eckles loaned father over one thousand dollars and offered father the opportunity to repay the loans by removing six trees from Eckles's property. Eckles also offered father additional payment to cut up the trees and stack the wood. Father completed work on only one of the six trees.

During the last several weeks Eckles worked with father, Eckles observed no progress on father's part in achieving any of the goals established for him. When Eckles stressed to father the importance of cooperating with DSS, father told Eckles he did not ask for any help from DSS and that "DSS can kiss my ass." On May 31, 2006, Eckles arranged transportation for father to attend his anger management meeting.[3]

As of December 2006, father had had no contact with M.C. for six months and had held a job for only two-week intervals before being fired or quitting. He had failed to secure stable housing, and DSS was unable to contact him for three months because he refused to provide an address. Father discharged the teaching parent assigned to him, and was not living with M.C.'s mother because of domestic violence issues.

Eva Elm, M.C.'s foster mother, testified M.C. had lived with her for eighteen months and she was willing to adopt him. According to the foster care service review plan, M.C. had a "strong bond" with his foster parents, was healthy, and was "average to advanced in his growth and development."

M.C.'s birth mother testified that father was not a good parent and that she had concerns about the child's safety in the father's presence because of father's anger problems. Mother stated she had had another child with father after M.C.'s removal, but father had no contact with that child and provided no support.

Father disputed the testimony given by the other witnesses. He denied receiving any counseling from Eckles and stated that the tree work for Eckles was not completed because Eckles refused to pay him. He also denied taking Eckles's car out of state.

---

[3] Eckles had attempted to assist father by lending him a car, but father damaged the car when he took it out of state without Eckles's permission.

While he admitted he failed to stay in touch with DSS regularly after May 2006, he stated he was homeless and living out of his truck. Father explained his failure to appear at the March 6, 2006 hearing on his lack of transportation. He stated he attempted to contact DSS and received no response.

Father did not deny making a comment to Gooden about "losing it," but noted he was struggling with homelessness at that time. He denied cursing at Gooden in May 2006, and disputed allegations of domestic violence between him and M.C.'s mother. Father attributed the delay in his psychiatric evaluation to DSS's initial refusal to pay for it rather than his lack of cooperation.

At the time of the hearing, father had applied for three jobs in the past three months. He described his employment as "day work" with the local illegal immigrant population. He acknowledged he relied on food stamps and had applied for Social Security disability due to six slipped discs in his back. While denying the lack of steady work, father observed his work was "seasonal" and in short supply during winter months. Father stated he had maintained the same address since January 2007.

### Analysis

Father asserts that the trial court erred by terminating his residual parental rights under Code § 16.1-283(C)(1) and (2). We disagree.

In reviewing a decision to terminate a parent's residual parental rights, we are mindful that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action,'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (citation omitted), but presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests,'" Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656,

- 4 -

659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). "The

trial court's judgment, 'when based on evidence heard *ore tenus,* will not be disturbed on appeal

unless plainly wrong or without evidence to support it.'" Toms v. Hanover Dep't of Soc. Servs.,

46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d

at 659). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in

making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting

Farley, 9 Va. App. at 328, 387 S.E.2d at 795).

Code § 16.1-283(C)(1) provides in pertinent part as follows:

> The residual parental rights of a parent . . . of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent . . . or other voluntary relinquishment by the parent . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> The parent . . . [has], without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent . . . and to strengthen the parent-child relationship. Proof that the parent . . . [has] failed without good cause to communicate on a continuing and planned basis with the child for a period of six months shall constitute prima facie evidence of this condition . . . .

Thus, to grant the petition for termination pursuant to Code § 16.1-283(C)(1), the trial

court was required to find by clear and convincing evidence that (1) termination was in M.C.'s

best interests; (2) DSS made "reasonable and appropriate" efforts to communicate with father

and strengthen father's relationship with M.C.; (3) father failed, without good cause, to maintain

continuing contact with M.C. for a six-month period following his placement in foster care; and

(4) father failed, without good cause, to provide or substantially plan for M.C.'s future for a

six-month period following his placement in foster care.

On appeal, father contends his failure to maintain continuing contact with M.C. was not "willful" because his homelessness and DSS's lack of response prevented him from seeing the child. While relying on his homelessness to justify his lack of contact with M.C., appellant also argues he satisfied the "main" condition leading to M.C.'s removal because he secured "stable housing." He also maintains he was not provided the services necessary to meet the conditions for M.C.'s return home, noting that he did not complete the psychiatric evaluation until "late in the process" because DSS initially refused to pay for the evaluation and he lacked the financial means to pay for it himself.

"The credibility of witnesses and the weight to be accorded their testimony is a matter within the sole province of the finder of fact." Akers v. Fauquier County Dep't of Soc. Servs., 44 Va. App. 247, 264, 604 S.E.2d 737, 745 (2004). In resolving the conflicts in the testimony, the trial court specifically rejected father's testimony in favor of that given by DSS witnesses. The trial court believed the testimony from DSS witnesses that father had failed to make any significant progress in achieving the goals which had been established for him. It found that father had failed to find appropriate housing, to comply with the services offered by Eckles, and to complete the parenting class or anger management program.

While father maintains he has a "stable residence," he points to nothing in the record regarding the specific nature of the housing or its suitability for a young child. Despite Eckles's extraordinary efforts to provide father with income and transportation, father refused to perform readily available work and failed to abide by the conditions established for the use of Eckles's vehicle. DSS witnesses testified father refused to provide them with contact information after May 2006, and that father told Eckles in May 2006, "DSS can kiss my ass."

The record is also clear that father has anger management issues which he has failed to address successfully. M.C.'s biological mother testified that father is not a good parent and

expressed concern that M.C. would not be safe in his father's care. Even father admitted to DSS he was afraid of "losing it" in the child's presence.

In contrast, M.C. is developing normally in the care of the foster parents with whom he has resided since he was three months old. He has developed a strong bond with his foster parents, and his foster mother has expressed her willingness to adopt him.

Based upon this record, we cannot say the trial court's decision to terminate father's parental rights pursuant to Code § 16.1-283(C)(1) was plainly wrong or without evidence to support it. Clear and convincing evidence established that father had failed, without good cause, to "maintain continuing contact and to provide or substantially plan for . . . [M.C.]'s future . . . for . . . six months after his placement in foster care" and that termination was in M.C.'s "best interests." Code § 16.1-283(C)(1).

Father also contends the trial court erred in terminating his residual parental rights pursuant to Code § 16.1-283(C)(2). Because we conclude the trial court's decision terminating father's parental rights was warranted under Code § 16.1-283(C)(1), we need not reach this issue. When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Fields, 46 Va. App. at 8, 614 S.E.2d at 659 (termination of parental rights upheld under one subsection of Code § 16.1-283 forecloses need to consider termination under alternative subsections).

Accordingly, the trial court's judgment is affirmed.

Affirmed.